UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CEDRIC L. DANIELS,<br><br>  Petitioner,<br><br>  v.<br><br>DAVE DAVEY,<br><br>  Respondent. | Case No. 1:15-cv-01211-DAD-JDP<br><br>FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR A WRIT OF HABEAS CORPUS<br><br>OBJECTIONS DUE WITHIN FOURTEEN DAYS<br><br>ECF No. 23 |

Petitioner Cedric L. Daniels, a state prisoner represented by counsel, seeks a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner claims constitutional violations arising from evidentiary rulings, ineffective assistance of counsel, jury instructions, and sentencing. We recommend that the court deny the petition for the reasons discussed below.

**I.   Background**

Petitioner challenges his conviction and sentence arising from an armed robbery. According to the government, petitioner and an accomplice, Lovelle Mixon, robbed Tony Moushi and his mother, Suhila Hana, with a firearm, injuring Moushi in the process. After a jury trial, petitioner was convicted of two counts of first degree robbery and one count of assault with a firearm. The jury also found that petitioner used a firearm in connection with the robberies and personally inflicted great bodily injury in connection with the assault. At sentencing, the trial court found two prior strikes for the purposes of California's three-strike law, and petitioner was sentenced to an aggregate prison term of thirty-five years to life.

The following facts are drawn from the opinion of the Court of Appeal of the State of California, Fifth Appellate District ("Court of Appeal"), and a presumption of correctness applies to these facts. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015); ECF No. 31-17. An independent review of the record, *see Nasby v. McDaniel*, 853 F.3d 1049, 1054-55 (9th Cir. 2017), warrants the adoption of the following facts as a fair and accurate summary of the underlying offenses.

> In early 2009, Desiree Werner shared a home with Mixon, [petitioner] and Johnny Walker, who is [petitioner's] brother. Werner overheard [petitioner], Mixon and Walker planning to rob a home that they believed contained $100,000 in cash and jewelry. Werner saw [petitioner] in possession of a small handgun during February 2009.
>
> One day prior to February 21, 2009, Moushi saw [petitioner] standing outside a cigarette store next to one of Moushi's friends. Moushi was wearing two necklaces, a diamond cross, a distinctive ring and a watch in a visible manner.
>
> Around 8:45 p.m. on February 21, 2009, Hana returned home from work. She made a telephone call and then noticed that a man, subsequently identified as Mixon, was standing near her. Mixon pointed a handgun at Hana's head and pushed her to the ground.
>
> Moushi walked into his mother's house. A man, subsequently identified as [petitioner], pointed a gun at him. Moushi told Hana to call the police. Mixon hit Hana with his gun and knocked the phone away from her.
>
> Moushi lunged for [petitioner's] gun and the two men struggled. [Petitioner] pushed Moushi to the ground and pointed his gun at Moushi's chest. [Petitioner] repeatedly kicked Moushi and hit him with the gun. [Petitioner] told Moushi to cooperate and said, "I am going to shoot you. I am going to kill you." [Petitioner] pulled the necklaces Moushi was wearing off his neck and took some money out of Moushi's pocket. He demanded to know where Moushi kept his "shit."
>
> Mixon grabbed Hana by the hair and dragged her into the living room where Moushi and [petitioner] were struggling. Mixon told Moushi to cooperate and hit Moushi with his gun butt.
>
> [Petitioner] dragged Moushi into the bathroom. He told Moushi to cooperate and repeatedly hit him with the gun. Mixon grabbed Hana and they entered the bathroom. Mixon made Hana look at Moushi's face and said that he was going to cut it up unless Moushi cooperated. Mixon was holding a knife at the time as well as a gun. Mixon threatened to kill both Moushi and Hana if he did not get "what he came here for." [Petitioner] demanded to know where Moushi kept his belongings. He took a watch, ring and earrings that

Moushi was wearing. [Petitioner] sporadically left the bathroom and looked around the house.

Mixon shoved Hana into a bedroom. [Petitioner] searched Moushi's and Hana's bedrooms. Moushi heard [petitioner] talking to someone on the phone about the layout of the house and where "stuff was."

Hana was brought back into the bathroom. Mixon and [petitioner] debated whether or not they should kill Moushi and Hana. They told Moushi that they were going to kill him. Eventually Moushi and Hana realized that [petitioner] and Mixon had left the house. They drove to a relative's house and called the police.

Moushi suffered contusions and cuts from having been hit and stomped. He required stitches on his left temple and medical staples on the back of his head to close wounds. His injuries left scars.

During the robbery, [petitioner] and Mixon stole, inter alia, a rifle, several pieces of jewelry and approximately $3,000. The stolen jewelry consisted of yellow diamonds in the shape of a cross, chains, bracelets, a watch, a distinctive ring and earrings.

Werner saw Mixon, [petitioner] and Walker return home during the evening of February 21, 2009. The men were excited and talked among themselves about having robbed an "Arabian dude" and his mother. Walker said to Mixon "that he should have hit the dude harder with the gun." The shirt that Mixon was wearing and Mixon's handgun were covered in blood. Mixon carried a rifle, [petitioner] carried a black bag, and Walker carried a small case containing a handgun. The black bag contained men's jewelry, which was dumped on a table. Werner looked at the jewelry. There were yellow diamonds, chains, necklaces, watches and a ring. The three men divided the jewelry among themselves. Werner looked at photographs of the jewelry that was stolen from Moushi and recognized several of the pieces.

*People v. Daniels*, No. F064237, 2014 WL 1456997 at *1-3 (Cal. Ct. App. Apr. 10, 2014).

## II. Discussion

A federal court may grant habeas relief when a petitioner shows that his custody violates federal law. *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75 (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See* § 2254; *Harrington v. Richter*, 562 U.S. 86, 97 (2011); *Woodford v. Garceau*, 538 U.S. 202, 206-08 (2003). To decide a Section 2254 petition, a federal court examines the decision of the last state court that issued a reasoned opinion on petitioner's habeas claims. *See Wilson v. Sellers*,

138 S. Ct. 1188, 1192 (2018). The standard that governs our review of the state court's decision depends on whether the state court adjudicated petitioner's claims on the merits.

When a state court has adjudicated a petitioner's claims on the merits, a federal court reviews the state court's decision under the deferential standard of Section 2254(d). Section 2254(d) precludes a federal court from granting habeas relief unless a state court's decision is (1) contrary to clearly established federal law, (2) a result of an unreasonable application of such law, or (3) based on an unreasonable determination of facts. *See* § 2254(d); *Murray v. Schriro*, 882 F.3d 778, 801 (9th Cir. 2018). A state court's decision is contrary to clearly established federal law if it reaches a conclusion "opposite to" a holding of the United States Supreme Court or a conclusion that differs from the Supreme Court's precedent on "materially indistinguishable facts." *Soto v. Ryan*, 760 F.3d 947, 957 (9th Cir. 2014) (citation omitted). The state court's decision unreasonably applies clearly established federal law when the decision has "no reasonable basis." *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011). An unreasonable determination of facts occurs when a federal court is "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Loher v. Thomas*, 825 F.3d 1103, 1112 (9th Cir. 2016). A federal habeas court has an obligation to consider arguments or theories that "could have supported a state court's decision." *See Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2557 (2018) (quoting *Richter*, 562 U.S. at 102). In addition, one rule applies to all state prisoners' petitions adjudicated on the merits: the petitioner must show that the state court's decision is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Even when a state court does not explicitly address a petitioner's claims on the merits, a Section 2254 petitioner still must satisfy a demanding standard to obtain habeas relief. When a state court gives no reason for denying a petitioner's habeas claim, a rebuttable presumption arises that the state court adjudicated the claim on the merits under Section 2254(d). *See Richter*, 562 U.S. at 99. And a federal habeas court's obligation to consider arguments or

theories that could support a state court's decision extends to state-court decisions that offer no reasoning at all. *See Sexton*, 138 S. Ct. at 2557.

If a state court denies a petitioner's habeas claim solely on a procedural ground, then Section 2254(d)'s deferential standard does not apply. *See Visciotti v. Martel*, 862 F.3d 749, 760 (9th Cir. 2016). However, if the state court's decision relies on a state procedural rule that is "firmly established and regularly followed," the petitioner has procedurally defaulted on his claim and cannot pursue habeas relief in federal court unless he shows that the federal court should excuse his procedural default. *See Johnson v. Lee*, 136 S. Ct. 1802, 1804 (2016); *accord Runningeagle v. Ryan*, 825 F.3d 970, 978-79 (9th Cir. 2016). If the petitioner has not pursued his habeas claim in state court at all, the claim is subject to dismissal for failure to exhaust state-court remedies. *See Murray v. Schriro*, 882 F.3d 778, 807 (9th Cir. 2018).

If obtaining habeas relief under Section 2254 is difficult, "that is because it was meant to be." *Richter*, 562 U.S. at 102. As the Supreme Court has put it, federal habeas review "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Id.* at 103 (citation omitted). Our habeas review authority serves as a "guard against *extreme* malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (emphasis added).

Here, petitioner claims constitutional errors in evidentiary rulings, ineffective assistance of counsel, errors in jury instructions, and errors in sentencing. Petitioner has not shown that he is entitled to habeas relief.

**a. Evidentiary rulings**

Petitioner raises four claims that pertain to the trial court's evidentiary rulings. First, petitioner contends that the trial court erred by limiting the impeachment of Tony Moushi, an alleged victim, when the court barred questions about Moushi's prior convictions and pending deportation proceedings. Second, petitioner contends that the trial court erred by limiting his impeachment of Desiree Werner, the government's witness, when the court barred questions

about Werner's past acts of prostitution and theft as well as pending charges related to prostitution. Third, petitioner contends that the trial court erred by admitting hearsay evidence during the examination of Werner. Fourth, petitioner contends that the trial court erred by admitting evidence of prior misrepresentations during the cross-examination of Scott Fraser, petitioner's expert witness on eyewitness identification. Petitioner claims that these errors in evidentiary rulings violated various rights under the Fifth, Sixth, Fourteenth Amendments.

The alleged errors in the evidentiary rulings were at most harmless. The standard from *Brecht v. Abrahamson*, 507 U.S. 619 (1993), governs the harmless-error inquiry here. *See Dixon v. Williams*, 750 F.3d 1027, 1034 (9th Cir. 2014) (per curiam). Under *Brecht,* a petitioner can obtain federal habeas relief only if "the error had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 637. To satisfy this standard, the court must have "grave doubt" as to the outcome, meaning that "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *See O'Neal v. McAninch*, 513 U.S. 432, 435 (1995). The *Brecht* standard applies "in virtually all" Section 2254 cases, *see Fry v. Pliler*, 551 U.S. 112, 117 (2007), and only in rare cases involving truly egregious errors can a federal court grant habeas relief without the harmless-error inquiry.[1]

Here, the record shows that the alleged evidentiary errors were harmless. Aside from the testimony of witnesses at issue here—Moushi, Werner, and Fraser—the government had enough evidence to show petitioner's guilt and to enhance his sentence for infliction of great

---

[1] Cases that would circumvent the harmless-error inquiry are truly rare. Such a case is one involving "a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct" that "might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." *See Brecht*, 507 U.S. at 638 n. 9. Examples of such egregious errors include requiring representation by counsel who has a conflict of interest, *Holloway v. Arkansas*, 435 U.S. 475, 489 (1978), trial before a judge who has a direct pecuniary interest in the outcome, *Tumey v. State of Ohio*, 273 U.S. 510, 535 (1927), precluding counsel of choice from representing a criminal defendant, *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006), and precluding exculpatory evidence during a cross-examination, *see Holley v. Yarborough*, 568 F.3d 1091, 1098 (9th Cir. 2009).

bodily injury. One of the two victims, Suhila Hana, identified petitioner in court. RT 3:572-75.[2] Hana testified that she saw petitioner enter her bedroom with a gun and search through her belongings. *See* RT 3:519-23, 525-26, 561-62. She heard petitioner telling Mixon to "go search" while petitioner "take[s] care of Ton[y] [Moushi]." RT 3:523-24. She saw petitioner kicking Moushi in various parts of his body. RT 3:508-11, 514-15. She also testified that petitioner hit Moushi in the head with the gun, causing bleeding. RT 3:511-12, 522, 530.[3] She testified that she saw petitioner grabbing a watch, jewelry and cash from Moushi. RT 3:512-14. She also testified that she had missing items after the robbery. RT 3:536-38. She identified the stolen items in court. RT 3:538-42. Petitioner does not contend that the examination of Hana was deficient in any way.

In contrast, the evidentiary rulings challenged by petitioner do not raise grave doubt as to the trial's outcome. As for Moushi's impeachment, the evidence that petitioner sought to introduce—a conviction for unlawfully carrying a firearm, the deportation proceedings that resulted from the same firearm conviction, and a dismissed charge for cultivating marijuana— fall short of showing Moushi's dishonesty, so the lack of impeachment based on those matters does not raise grave doubt as to the trial's outcome. As for Werner, she testified that she had been a prostitute, that she had attempted to possess a stolen vehicle, and that she received nothing in return for testifying in petitioner's trial other than expenses for food and travel, *see* RT 2:263-65, 318-19, so the lack of impeachment based on acts of prostitutions and pending cases pertaining to prostitution does not raise grave doubt either. As for the purportedly hearsay statements—statements made by petitioner and his co-conspirators—those statements were cumulative, given the government's other evidence, namely Hana's testimony, which sufficed to show petitioner's guilt and to enhance his sentence. As for Fraser's impeachment,

---

[2] All "RT" citations refer to the reporter's transcript, which includes the trial transcript. All "CT" citations refer to the clerk's transcript, which includes the parties' court submissions.

[3] Even "[a]brasions, lacerations, and bruising can constitute great bodily injury" for the challenged sentence enhancement, as discussed further below. *See People v. Jung*, 71 Cal. App. 4th 1036, 1042 (1999).

the record does not show that the jury verdict would have been different if the government had not impeached him with a prior instance of misrepresentation: Fraser testified that he had not interviewed any witness in petitioner's case and that he could not opine whether the eyewitnesses in petitioner's case were correct or incorrect. While Fraser's testimony might have helped the jury understand various factors affecting human memory, it would not have definitively rebutted eyewitnesses' accounts even if the jury accepted it as true. *See* RT 6:1146-48.

The alleged errors in evidentiary rulings challenged by petitioner were harmless. Petitioner therefore cannot obtain habeas relief based on the challenged evidentiary rulings.[4]

### b. Jury instructions

Petitioner contends that the trial court erred in three ways with respect to jury instructions. First, petitioner argues that the trial court failed to instruct the jury on the law applicable to co-conspirators' statements. Second, petitioner contends that the trial court erred by instructing the jury that Mixon was an accomplice as a matter of law. Third, petitioner argues that the trial court erred by giving an improper jury instruction on eyewitness identification.

The first two arguments warrant little discussion. Aside from the co-conspirators' statements, the government had sufficient evidence to show petitioner's guilt and to enhance petitioner's sentence for infliction of great bodily injury, as discussed above. The alleged errors by the trial court—if they were errors at all—were harmless.

---

[4] Another problem with petitioner's challenges to the evidentiary rulings is that a federal habeas court cannot review questions of state evidentiary law. *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *Maquiz v. Hedgpeth*, 907 F.3d 1212, 1217 (9th Cir. 2018); *Alberni v. McDaniel*, 458 F.3d 860 (9th Cir. 2006). Although petitioner relies only on broad constitutional principles such as due process and the right to a fair trial, his appeals to such broad principles do not raise federal claims. *See Gray v. Netherland*, 518 U.S. 152, 162 (1996); *Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004). Only the holdings in the Supreme Court's decisions can identify "clearly established Federal law," *see Atwood v. Ryan*, 870 F.3d 1033, 1046 (9th Cir. 2017), and petitioner has not identified a Supreme Court holding supporting his argument that the evidentiary rulings violated the constitutional provisions he cites. Respondent highlights this deficiency in his answer, *see* ECF No. 32 at 26-27, 34-35, 41, but petitioner does not address the deficiency in his traverse, *see generally* ECF No. 39-1.

The third jury-instruction claim challenges an instruction that prompted the jury to consider an eyewitness's level of certainty. The trial court gave the following jury instruction on eyewitness identification:

> You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. In evaluating identification testimony, consider the following questions:
>
> 1. Did the witness know or have contact with the defendant before the event?
>
> 2. How well could the witness see the perpetrator?
>
> 3. What were the circumstances affecting the witness's ability to observe such as lighting, weather conditions, obstructions, distance, movement of the witness or perpetrators and duration of observation?
>
> 4. How closely was the witness paying attention?
>
> 5. Was the witness under stress when he or she made the observation?
>
> 6. Did the witness give a description and how does that description compare to the defendant?
>
> 7. How much time passed between the event and the time when the witness identified the defendant?
>
> 8. Was the witness asked to pick the perpetrator out of a group?
>
> 9. Did the witness ever fail to identify the defendant?
>
> 10. Did the witness ever change his or her mind about the identification?
>
> 11. *How certain was the witness when he or she made an identification?*
>
> 12. How quickly did the witness make the identification?
>
> 13. Are the witness and the defendant of different races?
>
> 14. Was the witness able to identify other participants in the crime?
>
> 15. Was the witness able to identify the defendant in a photographic or physical lineup?
>
> 16. Were there other circumstances affecting the witness's ability to make an accurate identification?

RT 8:1609-10 (emphasis added). Petitioner contends that the eleventh question violated his right to due process. He argues, "[S]cientific research has disproved the notion that witness certainty is a meaningful indicator of reliability. Thus, instructing jurors in petitioner's case that confidence is an indicator of reliability amounts to instructing them that a false proposition is true." ECF No. 23 at 58 (citations omitted). Petitioner concedes that the United States Supreme Court has allowed the consideration of eyewitnesses' certainty as a factor in deciding the reliability of eyewitness identification. *See id*.[5] The California Supreme Court, too, has allowed the jury to consider the level of certainty exhibited by an eyewitness, as the Court of Appeal noted on petitioner's direct appeal. *See People v. Johnson*, 3 Cal. 4th 1183, 1231-32 (1992); ECF No. 31-17 at 13.[6] Petitioner relies on state-court decisions from Massachusetts, Georgia, and New Jersey, but only a holding from the United States Supreme Court can establish a clearly established federal law. *See Atwood v. Ryan*, 870 F.3d 1033, 1046 (9th Cir. 2017). Because petitioner has not identified a Supreme Court holding supporting his claim, this court cannot conclude that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," as required by the AEDPA. *See* 28 U.S.C. § 2254(d)(1).[7]

---

[5] *See Neil v. Biggers*, 409 U.S. 188, 199-200 (1972) ("As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, *the level of certainty* demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.") (emphasis added); *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977) (listing *Biggers* factors, including "level of certainty").

[6] Indeed, the challenged jury instruction was a model jury instruction in California state court. *See* Cal. Jury Instr. Crim. 2.92; *Daniels*, 2014 WL 1456997 at *15.

[7] Petitioner also advances a perfunctory argument that his trial counsel was deficient because the attorney did not request a jury instruction that "witness certainty or confidence is not indicative or accuracy or reliability in the context of eyewitness identification." ECF No. 23 at 61. Because neither the United States Supreme Court nor the California Supreme Court has accepted petitioner's reasoning, his trial counsel was not deficient for failing to request such an instruction.

Petitioner has not shown that he is entitled to habeas relief based on the alleged errors in the jury instructions.

### c. Sentencing

Petitioner next challenges three aspects of his sentencing. First, he claims that insufficient evidence supported his enhanced sentence for infliction of great bodily injury. Second, he claims that insufficient evidence showed that his prior juvenile offense was a felony. Third, petitioner claims that the trial court erred in declining to strike his prior felony for the purposes of sentencing. We address each claim in turn.

#### i. Great bodily injury

California Penal Code Section 12022.7(a) imposes a sentence enhancement when a criminal defendant personally inflicts great bodily injury during the commission of a felony.[8] Section 12022.7(f) defines great bodily injury as "significant or substantial physical injury." The requisite injury need not be permanent, prolonged, or protracted. *See People v. Escobar*, 3 Cal. 4th 740, 750 (1992). "Abrasions, lacerations, and bruising can constitute great bodily injury." *People v. Jung*, 71 Cal. App. 4th 1036, 1042 (1999).

At the conclusion of trial, the jury found that petitioner had inflicted great bodily injury on Moushi under Section 12022.7(a). *See* CT 2:581. In this habeas proceeding, petitioner contends that the jury had insufficient evidence to reach that finding. Petitioner argues:

> The evidence suggests that either petitioner or Mixon hit Moushi with a gun that resulted in bleeding. However, Moushi did not describe any injuries, but did state that he received medical care. Moushi was not treated on the scene, nor did he leave in an ambulance. Petitioner contends that evidence that Moushi bled is insufficient to show great bodily injury. . . . [T]he jury could have only speculated as to how Moushi's injuries rose to the level of great bodily injury.

ECF No. 23 at 65-66.

---

[8] *See* Cal. Penal Code § 12022.7 ("Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years.").

11

The record undermines petitioner's argument. Moushi testified that petitioner had hit Moushi with a gun's handle about 26 times. RT 5:866-67. Photographs presented to the jury showed Moushi bleeding from his head. RT 5:898-99. Another photograph showed the back of Moushi's head "busted open" as a result of petitioner's attack. RT 5:900. Moushi showed the jury the scar that resulted from his injuries. RT 5:902-03. Moushi also identified Petitioner as the assailant. *See* RT 5:899-90 ("**Q**. Did that happen after Mr. Daniels hit you or Mr. Mixon hit you? **A**. I'm sure it was Mr. Daniels."). In addition, Hana testified that she observed that Moushi was bleeding on his head from where he was hit by the gun during the robbery. *See* RT 3:529-530 ("**Q**. Could you see where -- could you see where he was bleeding from? **A**. Yeah. He hit him in the -- with the gun here on this side. (Indicating.) **THE COURT**: Indicating the top of the head above the ear. **THE WITNESS**: Yeah."). The jury had sufficient evidence to find that petitioner caused great bodily injury to Moushi.

### ii. Juvenile offense

At sentencing, the trial court found that petitioner had two prior strikes, both of which were juvenile offenses, under California's three-strike law. *See* RT 9:1840, 1844. Petitioner challenges one of the two prior strikes, an assault conviction that resulted from petitioner's punching another ward while he was in juvenile custody. *See* ECF No. 23 at 68. Petitioner contends that the record from the relevant juvenile proceeding showed that he committed a misdemeanor, not a felony, because the sentencing court made no express statement that petitioner was a felon and placed him on probation. *See* ECF No. 23 at 68-71. Petitioner is mistaken.

Again, the record undermines petitioner's argument. The sentencing court in petitioner's juvenile proceeding stated:

> So I believe the evidence has shown, beyond a reasonable doubt, that [petitioner] did commit the offenses listed here 245(a)(1) and *felony assault* likely to produce great bodily injury. And, alternatively, a *felony battery* with serious bodily injury as well, too.

CT 3:772 (emphasis added); RT 9:1787. The sentencing court also found that petitioner caused great bodily harm under California Penal Code Section 12022.7. CT 3:772. Section

12

12022.7 applies only in felony cases. *See* Cal. Penal Code § 12022.7(a)-(e). Petitioner's assault offense was a felony.

### iii. Declining to strike a prior felony

Petitioner next challenges the trial court's decision not to strike his prior felony offense for the purposes of California's three-strike law. Under the California Supreme Court's decision in *People vs. Romero*, a sentencing court has the discretion to strike a prior felony conviction for the purposes of California's three-strike law in the interests of justice. *See* 13 Cal. 4th 497, 507 (1996). To decide whether to strike a prior felony conviction, a California court considers various factors, including the nature of the present offense, the criminal defendant's criminal history, the defendant's background, character, prospects, and other individualized considerations. *See People v. Williams*, 17 Cal. 4th 148, 163 (1998).

Petitioner contends that the trial court's denial of his attempt to strike his prior felony conviction was an arbitrary decision that violated his right to due process. *See* ECF No. 23 at 73. Petitioner does not develop an argument how the decision was arbitrary or how an erroneous decision under *Romeo* would violate his due process rights. And even if petitioner had a federal habeas claim, a reasonable jurist could find that the trial court did not err, as the Court of Appeal found on direct appeal in petitioner's case. The Court of Appeal noted:

> [Petitioner] has been committing theft related crimes since he was 14 years old. Home monitoring, probation, short terms of incarceration in juvenile hall and adult jail all failed to extinguish [Petitioner]'s criminality. The current convictions are [Petitioner]'s third serious crime in less than 10 years. [Petitioner] committed the home invasion shortly after completing a three-year adult probationary period. His criminality is escalating; the home invasion robbery and assault are significantly more violent and serious than his prior crimes. [Petitioner] was armed with a handgun, which he used as a cudgel. There is nothing in [Petitioner]'s background or social history that removes him from the scope of the three strikes law. [Petitioner] lacks any substantial work history, educational accomplishments or vocational training. There is no indication that he financially supports his two children or is an active participant in their lives. [Petitioner]'s conduct as a whole was a strong indication of unwillingness or inability to comply with the law. It is clear from the record that prior rehabilitative efforts have been unsuccessful for him.

1 | *Daniels*, 2014 WL 1456997, at *20. Petitioner does not challenge this factual finding by the
2 | Court of Appeal. Given petitioner's extensive criminal history, a reasonable jurist could find
3 | that declining to strike a prior felony was not an error.

### d. Ineffective assistance of counsel

Petitioner argued on direct appeal that the trial court's evidentiary rulings that limited the impeachment of Moushi and Werner—the same evidentiary rulings discussed above—violated the Confrontation Clause. The Court of Appeal rejected petitioner's claim that his rights under the Confrontation Clause were violated, stating that by failing to raise the claim before the trial court, petitioner had forfeited the claim. In this habeas proceeding, petitioner contends that he had ineffective assistance of counsel because his trial counsel failed to preserve the Confrontation Clause claim for appeal.

A doubly deferential standard governs a federal habeas petitioner's claim of ineffective assistance of counsel. *See id*. at 105. On direct appeal, the two-step inquiry from *Strickland v. Washington* guides the analysis for an ineffective-assistance-of-counsel claim. *See* 466 U.S. 668, 687 (1984). First, a criminal defendant must show some deficient performance by counsel that is "so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Id*. Second, the defendant must show that the deficient performance caused him prejudice, which requires "showing that counsel's errors were so serious as to deprive [the petitioner] of a fair trial." *Id*. On habeas review, coupled with Section 2254(d)'s fairminded jurist standard, the *Strickland* requirements become even more deferential: the question is "whether there is *any* reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105 (emphasis added). That is, if there is even *one* reasonable argument that counsel did not violate the *Strickland* standard—even if the state court has not identified such argument—the petitioner cannot obtain habeas relief. *See id*. at 106.

Here, petitioner cannot satisfy the prejudice prong of the *Strickland* standard. As discussed above, the government had sufficient evidence to show petitioner's guilt and to enhance his sentence aside from Werner's and Moushi's testimony. Even if petitioner's trial

1 counsel had raised the Confrontation Clause claim before the trial court, a reasonable jurist
2 could conclude that the trial counsel's error did not deprive petitioner of a fair trial. Petitioner
3 therefore cannot obtain habeas relief for the alleged ineffective assistance of counsel.

### e. Cumulative error

Finally, petitioner contends that, individual errors challenged above had the cumulative effect of making his trial fundamentally unfair. Petitioner does not develop an argument how the alleged errors considered together constituted a violation of federal law. This court cannot itself supply an argument in support of petitioner. In addition, the government had sufficient evidence to show petitioner's guilt and to enhance his sentence, as discussed above. The record, considered together, does not show a ground for habeas relief.

## III. Certificate of appealability

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order adverse to a petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997). A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has not made a substantial showing of the denial of a constitutional right. Thus, the court should decline to issue a certificate of appealability.

## IV. Findings and recommendations

The court should deny the amended petition for a writ of habeas corpus, ECF No. 23, and decline to issue a certificate of appealability.

These findings and recommendations are submitted to the U.S. District Court Judge

15

presiding over this case under 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within 14 days of the service of the findings and recommendations, petitioner may file written objections to the findings and recommendations with the court and serve a copy on all parties.  That document must be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The District Judge will then review the findings and recommendations under 28 U.S.C. § 636(b)(1)(C).

IT IS SO ORDERED.

Dated:    January 4, 2019

UNITED STATES MAGISTRATE JUDGE